**MELLON NAT. BANK v. CITIZENS BANK & TRUST CO. OF CAMDEN, ARK., et al.***

No. 10757.

Circuit Court of Appeals, Eighth Circuit.

Feb. 18, 1937.

*Rehearing denied March 18, 1937.

Benjamin E. Carter, of Texarkana, Ark. (A. L. Burford and Willis B. Smith, both of Texarkana, Ark., on the brief), for appellant.

J. E. Gaughan, of Camden, Ark. (T. J. Gaughan and E. E. Godwin, both of Camden, Ark., on the brief), for appellees.

Before GARDNER, THOMAS, and FARIS, Circuit Judges.

GARDNER, Circuit Judge.

This case was treated as a suit in equity below, although the only substantial relief sought was damages for the loss of certain Travelers Cheques issued by appellant and sent to the appellee Citizens Bank & Trust Company for sale. We shall refer to the parties as they were designated in the lower court.

The suit was tried on stipulation of facts, from which it appears: That between November 5, 1931, and June 21, 1933, certain Travelers Cheques issued by plaintiff were delivered to defendant Citizens Bank & Trust Company to be sold and delivered by it to purchasers. These cheques were in denominations of $20 each, and were in substantially the following form:

"20 $20 Travelers Cheque for $20 20"
Signature of
  Holder ......................No.....
      Mellon National Bank
    Pittsburgh, Pennsylvania.
Through its Correspondents
  will pay to
  the order of..........Date of Issue....

In the United States | In other countries
Twenty Dollars $20.00 | at Bankers Buying Rate of Exchange for Checks of New York.

When countersigned with the above signature and presented within one year from date of issue.

MELLON NATIONAL BANK
OF PITTSBURGH,
Countersign        B. W. Lewis, Cashier.
  here
.....................
"20                              20."

These cheques were delivered by plaintiff to defendant Citizens Bank & Trust Company and accepted and receipted for by said defendant pursuant to a form of receipt reading as follows:

"Trust Receipt.

"Received in trust from the Mellon National Bank its Travelers Cheques, executed in blank, as follows:

..Nos. to Inclusive for $10.00 each..
..Nos. to inclusive for $20.00 each..
..Nos. to inclusive for $50.00 each..
..Nos. to inclusive for $100.00 each..
..Nos. to inclusive for $200.00 each..

say, in all, ...... Dollars, $...... for which we accept the responsibility of due issue at a price not to exceed 100¼% of their face value and agree to account for same to said Mellon National Bank, as issued at 99¾% of said face value, the proceeds to remain as a trust fund until payment has been made in cash to the Mellon National Bank. We further agree to return to said Mellon National Bank, when called upon so to do, any of these cheques remaining in our hands, and should any of them be lost, stolen or surreptitiously put into circulation while in our possession, we agree to account for them in the same manner as if they had been regularly issued by us; and notice to said bank of such loss or theft, or notice to stop payment of such cheques, shall not be a bar to or prevent said bank from paying same when presented.

"CITIZENS BANK & TRUST CO.,
       "Camden, Ark.
..............................
              Cashier-Treasurer.
"Date ..................193.."

The cheques here in controversy are similar to those issued by other banks and express companies. They are sold to purchasers who at the time of purchase are required to sign them in the presence of the selling agent. They contain a blank line or

space for signature of the holder, on or in which the holder signs his name when the cheque is transferred or cashed. This is for the apparent purpose of enabling the transferee to determine by comparison of signatures·that the person presenting same is the bona fide holder thereof.

The trust receipt above set out was signed by the cashier of said defendant bank. He had not by any formal action of the board of directors been authorized to execute such an instrument, nor had the form of instrument been approved by any formal action of the board of directors; neither did the directors have any knowledge of the provisions of the trust receipt, and did not ratify the action of the cashier in signing same, except to the extent that they were chargeable with notice from the following facts.

For some time prior to November 5, 1931, the bank had been selling these cheques and continued to sell them up to the date of a robbery of the bank on June 21, 1933, and it was known to customers of the bank that it had such cheques for sale, and signs advertising for sale Travelers Cheques of the Mellon National Bank were displayed in the office of the bank. Receipt of said cheques and the sales thereof were from time to time entered on the books of the bank, and the payment made for them by the bank to the Mellon National Bank when sold were entered on the books of the bank, and the profits accruing from such sales were entered on the books. The cheques while in the possession of the bank were kept in a steel safe with other valuable securities of the bank. On the 21st of June, 1933, a band of armed men entered the bank and robbed it, forcing one of the employees to open the locked door of the steel safe and to take therefrom the securities, including the cheques in question, and they were carried away by the robbers. The officers of said defendant bank notified the Mellon National Bank by wire of the robbery, but notwithstanding this notice, the Mellon National Bank honored such of the cheques as were presented, by cashing them to the amount of $3,780. Later the robbers were apprehended and $800 face value of the Travelers Cheques were recovered and have been cancelled. Approximately $530 face value of the cheques are still outstanding, and have not been cancelled nor paid. The cheques which were cashed after the robbery were put in circulation, either by the robbers or by persons who obtained them from the robbers, but bore the signatures of persons purporting to be the holders thereof. The cheques paid by the Mellon National Bank after the robbery were cashed at various towns in the States of New York, Minnesota, Illinois, Indiana, Maryland, the District of Columbia, and Canada, but came to the Mellon National Bank through regular banking channels. They were apparently in regular form, bearing nothing on their face to charge any person with notice that they were stolen or that they had not been regularly issued. Before commencing this action, the plaintiff made demand for 99¾ per cent. of said $5,110 face value of the cheques. The bank received no compensation for the handling of these cheques, unless and until they were sold by it, in which event it retained 50 cents per $100 face value. There was no claim of any negligence on behalf of said defendant bank.

On these stipulated facts the lower court entered findings of fact and conclusions of law in favor of defendant Citizens Bank & Trust Company, expressing the view that (1) the trust receipt was a contract of guaranty which said defendant did not have authority to execute and its attempt so to do was an ultra vires act; (2) that if the bank had such authority, it could not be exercised by the cashier, and hence the act of the cashier did not bind the bank; and (3) that the Mellon National Bank was not obligated to pay the cheques that had been stolen, and for that reason its act in so doing created no liability so far as said defendant bank was concerned.

Plaintiff has appealed from the judgment entered, challenging the correctness of the lower court's conclusions of law.

Whether the defendant Citizens Bank & Trust Company had authority to enter into the trust receipt agreement depends upon the nature of that agreement. The lower court was of the view, and appellee Citizens Bank & Trust Company here contends that the contract was one of guaranty. The Supreme Court of Arkansas in First Nat. Bank of Ft. Smith v. Nakdimen, 111 Ark. 223, 163 S.W. 785, 786, Ann.Cas.1916A, 968, referring to a contract of guaranty, said: "'A guaranty,' as is stated in one of the encyclopedias of law, 'is a collateral undertaking by one person to be answerable for the payment of some debt or the performance of some duty or contract for another person who stands

first bound to pay or perform. There can only be a contract of guaranty where there is some principal or substantive liability to which it is collateral; if there is no debt, default, or miscarriage of a third person either present or prospective, there can be nothing upon which to base a contract of guaranty.' 20 Cyc. p. 1397."

█ A "guaranty" is a collateral agreement, and it imports the existence of two different obligations, one that of the principal debtor, and the other that of the guarantor. See, also, Border Nat. Bank v. American Nat. Bank (C.C.A.5) 282 F. 73; Merchants' Nat. Bank v. Citizens' State Bank, 93 Iowa, 650, 61 N.W. 1065, 57 Am. St.Rep. 284; Tidioute Savings Bank v. Libbey, 101 Wis. 193, 77 N.W. 182, 70 Am.St. Rep. 907.

█ The liability assumed by the Citizens Bank & Trust Company in the instant case was not secondary, but primary. Its promise did not run to the holders of the cheques, but to the maker. The contract more nearly resembles a contract of indemnity as defined by the Supreme Court of Arkansas in Hall v. Equitable Surety Co., 126 Ark. 535, 191 S.W. 32, 34, where it is said: "Contracts of indemnity 'are distinguished from those of guaranty and suretyship, in that in indemnity contracts the engagement is to make good and save another from loss upon some obligation which he has incurred, or is about to incur, to a third person, and is not as in guaranty and suretyship a promise to one to whom another is answerable.' 22 Cyc. 80."

We are clear that the contract evidenced by the trust receipt was not one of guaranty. The subject of the contract was these cheques which had been executed by the Mellon Bank, and under the provisions of the contract were deposited with the defendant with authority to issue and put in circulation. They were essentially cashier's cheques issued by the Mellon National Bank in the nature of a bill of exchange drawn by that bank upon itself and accepted by the act of issuance. Drinkall v. Movius State Bank, 11 N.D. 10, 88 N.W. 724, 57 L.R.A. 341, 95 Am.St.Rep. 693. In the hands of the defendant bank they were a special deposit and the contract under which they were deposited created the relation of bailor and bailee.

Section 684, Crawford & Moses' Digest of the Statutes of Arkansas, provides in part as follows: "Any bank organized under the laws of this State shall be permitted to receive money on deposit, and to pay interest thereon; to buy and sell exchange, gold, silver, coin, bullion, uncurrent money," etc.

By act passed by the Legislature of Arkansas in 1927 (1927 Session Laws, p. 297), relative to the liquidation of closed banks, provision is made for the classification of creditors as secured creditors, prior creditors, or general creditors. A "prior creditor" is defined as "the owner of a special deposit expressly made as such in said bank, evidenced by a writing signed by said bank at the time thereof, and which it was not permitted to use in the course of its regular business." Section 1.

█ Power to receive special deposits for safekeeping has been upheld as incidental to the power of banking corporations, particularly where the special deposit is not for the sole benefit or accommodation of the depositor, and it is now settled by the national courts that where a national bank had been accustomed to take deposits of money, securities, or other valuables, for safekeeping, and this practice is known to and acquiesced in by the directors, the bank, even in the absence of any special contract, is liable for loss of the property by carelessness of the bank.

█ A "Travelers Cheque," as has already been observed, has the characteristics of a cashier's cheque of the issuing bank. It is a bill of exchange drawn by the issuing bank upon itself and is accepted by the act of issuance, and the right of countermand as applied to ordinary cheques does not exist as to it. The defendant bank had the right to buy and sell bills of exchange under the above quoted statute. It is clear also that under the laws of Arkansas, it had the right to receive special deposits. Covey v. Cannon, 104 Ark. 550, 149 S.W. 514; Morgan v. State, 162 Ark. 34, 257 S.W. 364; Wimberley v. Bank of Portia, 158 Ark. 413, 250 S.W. 334. See, also, Commercial Nat. Bank v. Armstrong, 148 U.S. 50, 13 S.Ct. 533, 535, 37 L.Ed. 363. In the last-cited case it is said: "All deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter; and that other kind of deposit of money peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money, and loans it to the banker."

We conclude that the bank had authority to receive these cheques bearing the authorized signature of the Mellon National Bank, as a special deposit.

As it had the authority to accept this special deposit, it might either do so without special agreement, in which event its liability would depend upon the general law of bailments, or it could change that liability by special contract with the depositor. Manhattan Bank v. Walker, 130 U.S. 267, 9 S.Ct. 519, 32 L.Ed. 959; First Nat. Bank of Carlisle v. Graham, 85 Pa. 91, 27 Am.Rep. 628; Hale v. Rawallie, 8 Kan. 136; Cussen v. Southern California Savings Bank, 133 Cal. 534, 65 P. 1099, 85 Am.St.Rep. 221; Seevers v. Gabel, 94 Iowa, 75, 62 N.W. 669, 27 L.R.A. 733, 58 Am. St.Rep. 381; Grady v. Schwenler, 16 N.D. 452, 113 N.W. 1031, 14 L.R.A.(N.S.) 1089, 125 Am.St.Rep. 674, 15 Ann.Cas. 161; Sturm v. Boker, 150 U.S. 312, 315, 14 S.Ct. 99, 37 L.Ed. 1093; Sun Printing & Pub. Ass'n v. Moore, 183 U.S. 642, 22 S.Ct. 240, 46 L. Ed. 366; Commercial Electrical Supply Co. v. Missouri Commission Co., 166 Mo.App. 332, 148 S.W. 995; Mulvaney v. King Paint Mfg. Co. (C.C.A.2) 256 F. 612; 3 Williston on Contracts (1st Ed.) § 1946; Restatement of the Law of Contracts, § 460.

In the instant case, the defendant bank has confessedly enlarged its legal responsibility by the execution of this trust receipt. Its liability was not limited to the exercise of ordinary care, but it assumed the entire hazard and risk arising from loss of possession of the property. We think the bank had authority to execute the contract, and it remains to consider whether or not it has done so.

It is urged that the cashier was without authority to execute such a contract on behalf of the bank. It appears that this practice had been going on for several years. The directors either knew in fact, or had presumptive knowledge, of the practice indulged in by the cashier. The fact that the bank handled these cheques was made known to its customers and the public by advertising displayed in the bank, and the bank's books and records reflected the collections and transmittal of funds and the profits arising from this business. The practice was not only known to the directors, but was acquiesced in by them, and hence we conclude that the bank was bound by the contract.

The question of the sufficiency of the consideration going to the bank was urged in the lower court and is urged here, as a ground for holding the contract void. The defendant bank, however, did make some profit out of the business. The service was not a gratuitous one. Permission by plaintiff to defendant bank to handle these cheques was, we think, a sufficient consideration to support the contract. In Bloodworth v. Booser, 99 Ark. 238, 138 S. W. 457, 458, it is said: "But, in any event, mere inadequacy of consideration is not sufficient to defeat a promise."

We conclude that the contract was not without consideration.

Whether plaintiff was obligated to pay these cheques that had been stolen need not be considered. The hazard arising from the theft was one which it had contracted against presumably for the purpose of enabling it to maintain the integrity of these obligations and facilitate their circulation and sale. This was doubtless one of the purposes for requiring the contract of indemnity.

The judgment appealed from must therefore be reversed, but it remains to consider what judgment should be entered. Some of the stolen cheques were recovered and canceled; some of them were paid, while others have never been presented nor paid, and there is no evidence that they are in existence or that any demand for payment has ever been or will ever be made upon them. We are of the view that the provision of the contract as to damages cannot be sustained as liquidated damages because the damages are easily susceptible of determination. This does not affect the validity of the contract except as to the provision which attempts to fix the amount of recovery as the face value of the cheques. Compensation is all plaintiff is entitled to recover. It is not entitled to make a profit out of the misfortune of the defendant, nor to be in a better position by the recovery of damages for breach of contract than it would have been had the contract been performed. Laser v. Forbes, 95 Ark. 580, 130 S.W. 168; Luce v. Arkansas Brick & Mfg. Co., 125 Ark. 219, 188 S.W. 566.

We conclude that plaintiff is entitled to judgment for 99¾ per cent. of the amount actually paid in cashing the cheques that were stolen, without interest, because proper demand was not made for that amount before commencement of suit, and without

134

prejudice to the right of plaintiff hereafter, either by separate suit or in this suit upon supplemental pleading, the court retaining jurisdiction for that purpose, to recover such further amount, if any, that it may be required to pay on these cheques.

The judgment appealed from is therefore reversed, and the cause remanded, with directions to enter judgment in accordance with this opinion.